UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ANDREW MAGUIRE | ) | |
| 6508 Pyle Road | ) | |
| Bethesda, Maryland 20814 | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-01048 (EGS) |
| | ) | |
| PEOPLE FOR THE AMERICAN WAY | ) | |
| 2000 M Street, N.W. #400 | ) | |
| Washington, DC 20036 | ) | |
| | ) | |
| Defendant | ) | |

# FIRST AMENDED COMPLAINT; JURY TRIAL DEMANDED

## I.

### Nature of the Case

1.  This is a case of age discrimination in employment brought under the District of Columbia Human Rights Law.   In addition, plaintiff seeks damages for breach of contract, for promissory estoppel, and for wrongful discharge.

## II.

### Jurisdiction and Venue

2.  Plaintiff invokes the jurisdiction of this court pursuant to 28 U.S.C. Section 1332 (diversity).

3.  The amount in controversy exceeds the sum or value of $75,000.

4.  Venue is proper in the District of Columbia pursuant to 28 U.S.C. Section 1391(b) since defendant's principal place of business is in the District of Columbia.

**III.**

**Parties**

5.   Plaintiff Andrew Maguire is a resident of the State of Maryland.

6.   People for the American Way is a non-profit District of Columbia corporation with its principal place of business at 2000 M Street, N.W., Washington, D.C. 20036.

**IV.**

**Factual Allegations**

7.   People for the American Way was created to:  "to meet the challenges of discord and fragmentation with an affirmation of 'the American Way.' By this, we mean pluralism, individuality, freedom of thought, expression and religion, a sense of community, and tolerance and compassion for others. People For the American Way will reach out to all Americans and affirm that in our society, the individual still matters; that there is reason to believe in the future - not to despair of it - and that we must strengthen the common cords that connect us as humans and citizens."

8.   "The long term agenda of People For the American Way is broad. It includes reducing social tension and polarizations, encouraging community participation, fostering understanding among different segments of our society, and increasing the level and quality of public dialogue. As an educational institution, we shall communicate with the American people through printed materials, radio, television, public lectures and discussions."

9.   People for the American way was created to "gather information, analyze it, and distribute our findings to the public in a manner that provides for full and fair exposition on the issues. Our highest purpose is to nurture a national climate that encourages and enhances the human spirit rather than one which divides people into hostile camps."

10. "By educating the American people and raising their level of understanding about the basic tenets by which our society is sustained, People For the American Way seeks fulfill its mission."

11. PFAW claims that it stands for civil rights and equal rights, but does not apply those standards to all of its own employees.

12. At PFAW an unreasonable, unprofessional, and unlawful pattern of marginalizing, undermining, and discriminating against plaintiff, who is between the ages of 40 and 70, emerged.

13. The PFAW Personnel Manual (1997 Edition) provides that "It is our policy to evaluate employee performance on a regular basis." Section IV.A.

14. The PFAW Personnel Manual provides "As employees perform their duties on a daily basis, their supervisor should provide continuing guidance." Section IV.A.

15. "Each staff member will be evaluated by his/her supervisor at the end of the three-month introductory period." Section IV.A.

16. "Each staff member will be evaluated at the end of six months of employment, and at the end of the first year of employment." Section IV.A.

17. These evaluations are to be in writing. "The personnel evaluation form will be used for these evaluations…The Director of Personnel is responsible for the timely distribution and completion of evaluation forms." Section IV.A.

18. Plaintiff was extremely well-qualified for the position of Vice President for Institutional Development, a strategy, fund-raising, and institution building (internally and *vis a vis* external actors and audiences) position.

19. Plaintiff was born on March 11, 1939 and is currently 67 years of age.

20.  Plaintiff obtained his B.A. degree in religion at Oberlin (Ohio) College in 1961 and received his Ph.D. in government from Harvard University in 1966.

21.  Plaintiff served as an advisor on political and security affairs, United States Department of State, 1966-1969.  Plaintiff was a member, United States Delegation to the United Nations General Assembly for five sessions while with the United States Department of State.

22. Plaintiff was director, for the Mayor of the City of New York, of a regional urban development program 1969-1972.

23. Plaintiff served as a consultant, National Affairs Division, Ford Foundation, 1972-1974.

24. Plaintiff has extensive experience with fundraising.  He was elected as a Democrat to the Ninety-fourth, Ninety-fifth and Ninety-sixth Congresses (January 3, 1975-January 3, 1981). Plaintiff was a candidate for nomination to the United States Senate in 1982.  He raised significant funds for these races and also for a not-for-profit international development organization, EnterpriseWorks Worldwide, where he served as president, 1990-2002.

25. Plaintiff served as vice president for policy at another not-for-profit organization, World Resources Institute, 1984-1987, where he was also involved in marketing and fundraising.

26. Plaintiff was hired by PFAW as a consultant as of May 1 for a three month consultancy as a Senior Advisor to the President.

27.  Plaintiff's supervisor was Ralph Neas, (then age 58) the President of PFAW.

28.  After working for three months as a consultant, plaintiff was hired into a newly expanded position of Vice President for Institutional Development, a full time post that was to include working closely with the President of PFAW and the Board on fundraising strategy, building out and managing the Development Team, and working from this Vice President

4

position to integrate development planning and execution (previously isolated and ineffective under a succession of four or five development directors in as many years) more closely with other units in the organization, e.g., program, internet communications, regional offices, etc.

29. Plaintiff also, at the request of Chief of Staff Marge Baker, negotiated and assisted her in managing a contract with an internet fundraising consulting firm, Plus Three, and likewise at the invitation of Ms. Baker joined a strategic planning team led by the COS in a goals-setting effort undertaken for 2006 and still in effect.

30. Plaintiff was assured by Mr. Neas that he had his confidence and promised that he would have the support and cooperation and leverage within the organization to apply his experience and skills toward accomplishing these objectives.

31. PFAW promised plaintiff that the first step towards meeting these objectives would be the establishment of a new Board Development Committee with which plaintiff would work closely.

32. Despite promises from Mr. Neas, no Board Development Committee ever was established. As of May 25, 2006, more than one year after this commitment to plaintiff was made, no such committee had been established.

33. After first promising that plaintiff would be closely involved, and despite requests by plaintiff to participate, Mr. Neas excluded plaintiff from any and all discussions/actions with New York Board members re a new regional director and fundraising,

34. An opportunity arose for plaintiff to spend an evening with New York Board members and donors at a wine tasting fundraising event on September 28, 2005 – which would have permitted plaintiff to get a meaningful start in NY – but plaintiff was informed by Mr. Ucci

that he would need to pay the $3,000 ticket price because the host, a Board member, insisted that all attendees pay, and this made it prohibitive for plaintiff to attend.

35. Immediately thereafter, Dominic Ucci, (then age 54) PFAW's Executive Vice President/CFO, attended the same event without paying for a ticket.

36. As of  May 25, 2006, no new New York director has been hired and it has been impossible to schedule major fundraising events in New York or move forward in any meaningful way with expanding PFAW's fundraising base there.

37. Anastasia Staten (age 26) was promoted to Director of Major Gifts soon after plaintiff arrived at PFAW.

38. Despite repeated attempts by plaintiff orally and in writing over many months to elicit a planning proposal for an expanded major gifts program from the Director of Major Gifts, Ms. Staten produced only a few notes about what she was doing for Mr. Neas concerning those major donors over which Mr. Neas exercised exclusive control. Ms. Staten also reported periodically on her role in organizing and backstopping annual celebrity events in Los Angeles and Washington, D.C. that raise PFAW's profile but very little money after costs are deducted – events that she worked on almost exclusively with and under the direction of PFAW's other Executive Vice President and COO, Carol Blum.  Regrettably, Ms. Staten offered little by way of proposals for further major donor development despite plaintiff's continuing encouragement and suggestions that in her new more senior role she needed to do so.

39. Re-introduction of a lapsed President's Council was on Ms. Staten's list of things to do for six months but remained undone until after a first-rate Major Gifts Manager was hired. Similarly, a 2005 end of year letter to existing major donors and a 2006 newsletter began to take shape only after the new Major Gifts Manager joined the staff. This new staff person did almost

all the work on these projects, including coordinating them with plaintiff, but she resigned after several months of frustration with Ms. Staten, her immediate superior, with Mr. Neas, and with what she described on her departure as the "chaos" of Mr. Neas' and Ms. Staten's handling of major donor relations and programs.

40. Despite plaintiff's repeated requests over a number of months for lists of existing donors who might be upgraded, and for lists of prospects that plaintiff might approach to expand PFAW's major donor base, plaintiff was told by Ms. Staten, supported by Mr. Ucci and Mr. Neas, that hundreds of major donors and prospects were to be handled by Mr. Neas only. Nor were lists of any new donor prospects with contact information ever provided to plaintiff whereas without such lists it is not possible to design or execute a major donor outreach strategy.

41. Ms. Staten did not provide new donor research and prospecting capability of any sophistication. Despite plaintiff's best efforts to secure and retain qualified staff who could have helped upgrade the department's research and prospecting capabilities, defendant did not provide or acquire this essential fundraising infrastructure and as a direct result plaintiff was unable fully to deploy his recognized skills in new donor solicitation.

42. Outside fundraising consultants were hired by Mr. Neas on a continuous basis, but they reported only to him and despite attempts to attend/collaborate, plaintiff was systematically excluded from fundraising strategy, planning, and execution throughout the period of plaintiff's employment.

43. An ambitious agreed and budgeted plan for 2006 membership recruitment and dramatic expansion of PFAW's small donor fundraising base was months behind schedule through 2006 up to and including May 25 because Mr. Ucci failed to provide postage and other substantially overdue payments to vendors while shifting available funds to other purposes.

44. A proposal by plaintiff to fill a key and agreed upon foundation fundraising position was rejected by Mr. Ucci and Mr. Neas, and filling a proposed planned giving position was placed on indefinite hold.

45. The Director of Development Operations, Kristen Smith (age approximately 30), promoted into the position at the suggestion of plaintiff who appreciated her data management expertise and her knowledge of PFAW operations, Ms. Smith took it upon herself without consultation with plaintiff to criticize to Mr. Ucci and others plaintiff's supervision of her work, a gambit that was encouraged and supported by Mr. Ucci and ultimately by Mr. Neas as well, and one that contradicted plaintiff's career-long reputation as a sensitive and supportive manager who devolves authority and inspires and encourages those who work for and with him.

46. Every program or plan to raise funds proposed by plaintiff had to have Mr. Neas' and/or Mr. Ucci's approval. These approvals often were withheld despite the fact that Mr. Neas and Mr. Ucci had mandated considerable responsibility for achievement of their ambitious 2006 revenue goals to plaintiff and the development staff. Mr. Neas and Mr. Ucci systematically failed to provide plaintiff with the means to do the job that he had been hired for effectively and in a timely manner. As plaintiff attempted to discharge his responsibilities, roadblocks were placed in plaintiff's way continuously. It became clear that Mr. Neas and Mr. Ucci were not prepared to build out the necessary elements of a proper development team and set of fundraising programs as other organizations have found they must do to be successful in achieving revenue viability for an organization that seeks long-term growth.

47. Nevertheless, in a few months' time plaintiff both personally and through organizing and overseeing several new initiatives, raised hundreds of thousands of dollars for PFAW.

48.  Plaintiff also, to the benefit of PFAW, plugged significant gaps in maintaining PFAW's profile and fundraising potential in Chicago where there had been no effective senior leadership and no regional director in place up to and as of May 25, 2006.

49.  Upon his termination on May 25, 2006 Mr. Maguire was advised that he was being terminated without cause, that "it wasn't working," that it was "not a good fit."

50.  The person(s) announced as outside consultants to be hired by People for the American Way to replace parts of plaintiff's several roles with the organization are substantially younger than plaintiff.

51. Plaintiff, upon information and belief, understands that PFAW is re-hiring Mary Pat Bonner (age 33) and also hiring Jennifer Swanson (age 37), fundraising consultants, to perform part of the work that was to have been performed by plaintiff as Vice President for Institutional Development.

## V.

**First Cause of Action: Violations of the District of Columbia Human Rights Law**

52.  Plaintiff incorporates by reference paragraphs one through 51, inclusive.  Plaintiff reserves the right to amend this Claim as further investigation and discovery may warrant.

53.  At PFAW both subordinate staff (Ms. Staten and Ms. Smith) through their unprofessional and insubordinate conduct, and top executives (Mr. Ucci and Mr. Neas) through their encouragement and acquiescence in this conduct and otherwise, violated the District of Columbia Human Rights Law by discriminating against plaintiff because of his age in the terms and conditions of his employment.

54. People for the American Way willfully violated the District of Columbia Human Rights Law by discriminating on the basis of age knowingly and/or with reckless disregard for the law.

55. The District of Columbia Human Rights Law Subchapter II, Sec. 1-2512, outlaws discrimination in employment based upon "race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, physical handicap, matriculation, or political affiliation." (D.C. Code Ann. § 1-2501 et seq. (1987 & Supp. 1993).

## VI.

### Second Cause of Action:  Breach of Contract

56. Plaintiff incorporates by reference paragraphs one through 55, inclusive.

### A.  Breach of Agreement to Evaluate Plaintiff's Work

### Performance in Writing

57. People for the American Way agreed and promised plaintiff that he would be evaluated in writing three months, six months, and one year after beginning his employment, and that he would have the opportunity to participate in those evaluations through review of all written evaluation material and through a self-evaluation for which a separate section of PFAW's evaluation form is provided.

58.  People for the American Way did not evaluate plaintiff's work after three months, either verbally or in writing.

59. People for the American Way did not evaluate plaintiff's work after six months, either verbally or in writing.

60.  People for the American Way did not evaluate plaintiff's work after one year, either verbally or in writing.

61. People for the American Way failed to evaluate plaintiff's work performance in writing, or in any other appropriate or comprehensive way, at any time during his employment with the organization.

62. People for the American Way breached its agreement and promises to plaintiff to evaluate his work performance in writing at three, six and twelve months after being employed by the organization.

63. Athough at all times, plaintiff was ready, willing and able to perform all of his obligations under the terms of his hiring, People for the American Way breached its promises to encourage, support, and provide resources for plaintiff's proposals and plans for developing a fundraising program consistent with those that are standard at other similar organizations.

64. Plaintiff was damaged as a result of these breaches as it became very difficult to raise additional funds for PFAW when Mr. Neas and Mr. Ucci refused to approve fundraising staffing and initiatives proposed by plaintiff.

65. Plaintiff suffered damage as a result of PFAW's failure to give employee evaluations while simultaneously not allowing him to perform his job, as had been agreed to by Mr. Neas, Ms. Baker and Mr. Ucci, to anything close to its full potential based on plaintiff's experience, demonstrated skills, and sound plans for fundraising at PFAW. Roadblocks were put in his path by two young staff who ostensibly (but not de facto) reported to him, and by senior management, specifically Mr. Neas and Mr. Ucci, who cooperated with these more junior staff without consultation with plaintiff and created obstacles of their own in plaintiff's path.

66. The PFAW Personnel Manual (1997 Edition) provides that "It is our policy to evaluate employee performance on a regular basis." Section IV.A. Plaintiff understood the

terms of the Personnel Manual to constitute a part of his employment contract with PFAW and accepted these terms as part of this contract.

67. The PFAW Personnel Manual provides "As employees perform their duties on a daily basis, their supervisor should provide continuing guidance."  Section IV.A.  Plaintiff understood the terms of the Personnel Manual to constitute a part of his employment contract with PFAW and accepted these terms as part of this contract.

68. "Each staff member will be evaluated by his/her supervisor at the end of the three-month introductory period."  Plaintiff understood the terms of the Personnel Manual to constitute a part of his employment contract with PFAW and accepted these terms as part of this contract.

69. "Each staff member will be evaluated at the end of six months of employment, and at the end of the first year of employment."  Plaintiff understood the terms of the Personnel Manual to constitute a part of his employment contract with PFAW and accepted these terms as part of this contract.

70.  These evaluations are to be in writing.  "The personnel evaluation form will be used for these evaluations…The Director of Personnel is responsible for the timely distribution and completion of evaluation forms."  Section IV.A.  Plaintiff understood the terms of the Personnel Manual to constitute a part of his employment contract with PFAW and accepted these terms as part of this contract, and since evaluation forms were to be used, written evaluations were required.

71. Without written evaluations, plaintiff had no reason to believe that he was not performing as expected.

72. Without written evaluations, plaintiff could not take corrective steps to make sure that he was performing his job as expected.

73.   Essentially, defendant's failure to provide written evaluations to plaintiff (and it's failure to provide promised support for his work as agreed), played a key role in plaintiff's unexpected and inappropriate termination.

### B.  Breach of Agreement to Establish a
### Functioning Board Development Committee

74.   Plaintiff was promised by defendant that a functioning Board Development Committee would be established.  In May-June 2005, Ralph Neas promised plaintiff that Mr. Neas would establish with key people on the Board of Directors a new Board Development Committee with which plaintiff would work closely on fundraising.

75.   Despite continuing attempts on plaintiff's part to get PFAW and Mr. Neas to do what was promised to plaintiff, PFAW breached its promise to establish a Board Development Committee.  Such a committee was absolutely critical to plaintiff's ability to discharge the responsibilities assigned to him.

76.   Plaintiff pointed out and pursued this vitally important matter repeatedly over many months, both verbally and in emails with Mr. Neas and with the Board Member chosen by Mr. Neas to serve as Chair of the new Board Development Committee but the promised invitations to Board members to join the committee were never extended by Mr. Neas or by the proposed Chair.

77.   This agreement about the new committee was confirmed in writing by emails with defendant, other senior PFAW officers, and the Board Member chosen by Mr. Neas to serve as Chair of a new Board Development Committee, June 2005-May 2006.

## C.  Breach of Agreement to Permit and Encourage

## Plaintiff to Work with PFAW Boards of Directors

78.  Defendant promised plaintiff that plaintiff would be allowed to work closely with the full membership of the PFAW and PFAW Foundation Boards on fundraising, events, special projects, and would also be given the means and methods of more fully engaging Board members in the work of the organization.

79.  Ralph Neas confirmed to plaintiff that as VP for Institutional Development, plaintiff would work closely with the membership of both Boards.  Mr. Neas announced this plan to the Boards orally at a Board meeting.

80.  A follow-up email on this subject drafted by plaintiff with examples of how this would work was approved by Chief of Staff Baker to be sent to all Board members but it also developed that this email required approval from Mr. Ucci and Mr. Neas.  Their approval was never granted despite repeated attempts by plaintiff (and Ms. Baker) orally and by email to move the process along so that plaintiff could fulfill the commitment made by Mr. Neas to plaintiff and to the Boards.

81.  This commitment and plaintiff's efforts to get defendant to honor it, are confirmed in writing via emails with Mr. Neas, Mr. Ucci, Ms. Baker, December 2005-February 2006; May 2006.

82.  At his own initiative, plaintiff managed to work with a few Board members on several matters particular to their areas.  However, Mr. Neas and others at PFAW undermined plaintiff's efforts to work with the full membership of both Boards, thereby breaching the commitment to permit and encourage plaintiff's work with the PFAW Boards.

14

83. At his own initiative, plaintiff managed to work with a few Board members on several matters particular to their areas. Mr. Neas and others at PFAW undermined plaintiff's efforts to work with Board members, thereby breaching the commitment to permit and encourage plaintiff's work with the PFAW Boards.

84. Defendant breached this commitment to permit and encourage plaintiff to work with both Boards.

**D. Breach of Agreement to Fill Vacancies in Institutional Development Team**

85. PFAW agreed to give plaintiff the authority to hire Institutional Development Team staff.

86. When plaintiff became Vice President, Ralph Neas agreed to an organizational chart for the development staff that was drawn up by plaintiff in consultation with Chief of Staff Baker and the Director of Strategic Planning, Ann Beaudry. The plan was presented to Mr. Ucci and Mr. Neas, and was approved by Mr. Neas in August 2005.

87. Plaintiff was asked to take charge of searching for appropriate people to fill the vacancies that the plan identified as hires required to professionalize and build out PFAW's fundraising operations.

88. Over the months of his tenure as Vice President plaintiff wrote announcements and arranged for advertising for the vacant positions, interviewed candidates, and sought continuously to fulfill this assignment to build out the essential components of a properly functioning development team.

89. Plaintiff's attempts to fill out the profile agreed to by defendant on the approved organization chart were complicated, delayed, undermined, and at times rebuffed. Contrary to what plaintiff had been promised, plaintiff was belatedly told that new staff hires in plaintiff's

department had to be vetted and approved not only by plaintiff but also by other senior staff including Mr. Neas.

90. These approvals were unreasonably withheld.

91. When plaintiff located what he and Director of Strategic Planning Beaudry knew was a superb candidate for the important Director of Foundation Giving position that was open and needed to be filled if PFAW was to expand its foundation fundraising operations to meet 2006 fundraising targets, plaintiff found that despite promises from Mr. Neas to the contrary, plaintiff had to secure the approval of four other senior managers, plus Mr. Neas, for this or any other senior appointment within plaintiff's department.

92. Ultimately, after a series of interviews with this candidate and much cultivation of the candidate by plaintiff, Mr. Neas told plaintiff that he had other ideas about the position (that he was not willing to share), and that he would get to this matter later on (which he did not).

93. Plaintiff was prevented by Mr. Neas from hiring this candidate for this important fundraising position in plaintiff's department and within the domain of plaintiff's responsibility as outlined by Mr. Neas when plaintiff was appointed Vice President.

94. PFAW breached its agreement to allow plaintiff to hire Institutional Development Team employees.

95. These breaches are confirmed in writing by emails with Mr. Neas, Ms. Baker, Mr. Ucci, Ms. Blum, and Director of Human Resources Dibby Johnson, December 2005-January 2006.

**E. Breach of Agreement to Provide Plaintiff a Key and Properly**

**Coordinated Role with Major Donor Fundraising**

96. Ralph Neas assured plaintiff at the outset of plaintiff's employment that they would
work together on expanding the major donor base.  They agreed that it was essential that Mr.
Neas share information with plaintiff and the development team as to his continuing major donor
contacts so that they could jointly maximize results for the organization.

97. In partial early conformity with this commitment, Mr. Neas briefed plaintiff and the
development team after his West coast trip in August, 2005.   Mr. Neas committed to continue to
do this in weekly meetings in which information would be shared back and forth and strategies
developed.

98. However, subsequent scheduled weekly meetings were delayed, cancelled, and then
not scheduled at all.  Mr. Neas resumed his long-established pattern – well known and much
discussed inside the organization -- of not sharing information and excluding all others, including
plaintiff and plaintiff's staff, from his contacts with major donors.  Nor did he include plaintiff in
events and sessions with other senior staff and outside consultants regarding PFAW fundraising
strategy.

99. Plaintiff asked defendant on numerous occasions throughout his employment to be
included in events, meetings, and conversations with major donors and consultants, but was
rebuffed by defendant.

100.      Defendant breached the agreement to provide plaintiff with a key and
properly coordinated role in major donor fundraising.

### F. Breach of Agreement to Permit and Encourage Plaintiff to Play an Important Role in Upgrading New York Regional Office

101.     Defendant promised that plaintiff would be permitted and encouraged to play an important role regarding staffing and upgrading the regional office in New York.

102.     In breach of this promise, and despite reminders from plaintiff to defendant about the original plan to include plaintiff and move him into an increasingly important role in New York and East Coast operations, plaintiff was not allowed to join Ralph Neas in trips to New York, and was excluded from meetings and discussions at PFAW and with New York Board Members concerning the hiring of a new director for the New York regional office and the upgrading of the New York regional office's operations.

103.     In breach of this promise, despite having repeatedly indicated a willingness and desire to attend – and despite having made dozens of calls to major donors in support of the event – plaintiff was *de facto* excluded from attending a fundraising event with Board Members and major donors in New York City on September 28, 2005.

### G. Breach of Agreement that Plaintiff Was to be a Member of PFAW's Top Decision Making Team

104.     Plaintiff was promised when he joined PFAW that he would be a member of the *de facto* high-level strategy and decision-making team in the organization.

105.     Plaintiff made repeated requests and efforts to gain access to this high-level team, suggesting to Mr  Neas and other senior managers the utility and appropriateness of the Vice President for Institutional Development's participation .  Defendant breached this promise by excluding plaintiff from PFAW's high-level decision-making team.

### H. Breach of Agreement to Provide Necessary Funds to

### Institutional Development Team

106.     Defendant promised plaintiff that he would be provided with necessary

funding for the Institutional Development Team.

107.      A 2006 revenue budget that included fundraising targets for each of the

fundraising sectors  for which plaintiff and his team were responsible was drawn up and agreed

to by Ralph Neas.

108.     Defendant refused to perform its obligations under the budget plan and

breached the agreement with plaintiff through repeated delays.  By April/May 2006, it became

impossible to reach the $6 million revenue goal for the mail and telemarketing solicitation unit

because of repeated and serious delays in allocating the funds for mailing the hundreds of

thousands of pieces that were essential to reaching the target.

109.     Plaintiff and his staff repeatedly pointed out by email and orally that PFAW

would fall short by about $1 million as a result of these delays and that it was important for 2006

revenues to get back on track with disbursements for mailings as soon and as fully as possible.

Plaintiff and his staff presented all the relevant data on paper in a meeting with Mr. Neas and Mr.

Ucci in mid-May 2006.   (Money admittedly was short at the beginning of the year but the

available money was not going to fundraising but elsewhere).  Days later, plaintiff was notified

that he would be terminated.

110.      The breach of this agreement was confirmed in writing by emails and

analytical documents shared among development staff and with Mr. Neas, Mr. Ucci, and Ms.

Baker, March-May 2005.

## I. Breach of Promise to Provide Appropriate Office Space for VicePresident for Institutional Development.

111.    When plaintiff was appointed Vice President for Institutional Development in August 2005, he was assigned a small windowless office next to Chief of Staff Baker and across the hall from President Neas.  Plaintiff accepted these limited quarters on the understanding and clear commitment by PFAW that within several weeks, a wall would be knocked down to incorporate the space from an adjoining office.  Providing sufficient space for a small conference table for plaintiff to hold meetings and receive donors, staff, and visitors was important to his performance of his obligations.

112.    This agreed-to additional office space was not provided as promised.

113.    This breach of promise was another component of the systematic pattern of contract breaches by PFAW.  The cumulative pattern made it difficult if not impossible for plaintiff to adequately discharge his responsibilities as Vice President for Institutional Development.  Indeed, it would be fair to observe that Defendant not only breached many promises, but that its breaches prevented plaintiff from effectively performing the full array of his obligations.  When defendant prevents plaintiff from performing his obligations, Plaintiff is not in breach of his duties, and defendant's decision to terminate under these circumstances is itself tantamount to its breach of contract.

## J. Damages as a Result of Breaches

114.    Because of defendant's many breaches of its promises and agreements, defendant illegitimately terminated and wrongfully discharged plaintiff.

115.   Because of defendant's breaches, plaintiff was not permitted to perform his job and was blamed for not reaching certain revenue targets even though he was not given the means to do his job properly.

116.   As a proximate result of defendant's breaches of contract, plaintiff suffered the loss of his job, loss of income and benefits, a diminished reputation, and he continues to suffer a diminished prospect for obtaining another suitable job with another employer.

117.   For example, shortly after his termination from PFAW, plaintiff was asked to be a finalist for a CEO position at a major non-governmental organization, the Meridian International Center.

118.   Plaintiff found it necessary to explain to the search committee and the Chairman of the Board of Meridian, that he left PFAW after less than a year as Vice President for Institutional Development, and this significantly undermined his candidacy for the Meridian position, which was offered in July 2006 to another candidate.

## VII.

### Third Cause Of Action: Promissory Estoppel

119.   Plaintiff incorporates by reference paragraphs one through 118, inclusive.

120.   Plaintiff's reliance on defendant's promises with respect to his appointment as Vice President for Institutional Development was foreseeable to defendant.

121.   Plaintiff's reliance on defendant's promises was reasonable, and the fact that those promises were not honored by defendant had results that were severely detrimental to plaintiff.

122.   In declining opportunities that arose in September and October 2005 to be considered for senior executive positions at two other organizations, the American Institute of

Architects and Ford's Theater, plaintiff advised the respective organizations that he had recently

taken the Vice President appointment at PFAW, therefore was not available, and planned to stay

at PFAW based on the offer from PFAW that he had accepted.

123.    Several months later, after multiple promises made by defendant were breached,

defendant unjustly terminated plaintiff's employment after it was also too late for plaintiff to be

considered for positions that he had been invited to apply for.  In addition, plaintiff, reasonably

relying on defendant's promises and representations when the Vice President job was offered by

defendant and accepted by plaintiff did not take steps that he might have taken to search for

another job had plaintiff not reasonably relied on defendant's promises and representations.

124.    Plaintiff reasonably relied on statements made to him by Mr. Neas and other

senior executives at PFAW that with plaintiff's appointment as Vice President they greatly

desired to get past an unfortunate pattern of dismissals and premature departures of fundraising

directors during the previous five years of Mr. Neas' presidency, during which time fundraising

directors had stayed in place about a year or less, which defendant stressed was harmful to the

organization and to its fundraising efforts.  It was made clear to plaintiff by defendant that a

longer tenure was expected with plaintiff's appointment and it was explicitly explained that the

task of fundraising and institutional development required a building out process and an

upgrading of operations that could not be accomplished in a short time frame.

125.    Even if no contract breach is found, plaintiff reasonably and foreseeably relied to

his detriment in accepting the Vice President position with PFAW on the multiplicity of

promises and explicit expectations recited above.  The promises made and expectations stated

by defendant to encourage plaintiff to accept the position being offered and therefore plaintiff's

reliance on those promises and statements was both foreseeable to defendant and at the same time wholly reasonable on the part of plaintiff.

126.    In addition to the loss of opportunities at the American Institute of Architects, Ford's Theater, and the Meridian International Center, defendant's failure to honor defendant's promises to plaintiff resulted in plaintiff suffering the loss also of this job with PFAW, loss of income and benefits, a diminished reputation, and he continues to suffer a diminished prospect for obtaining another suitable job with another employer as a result of the unjust and illegitimate termination of plaintiff's position just nine months after his appointment.

127.    Failure to compensate plaintiff's losses after his reasonable reliance on defendant's promises and representations made when defendant offered the job to plaintiff, and plaintiff's reasonable reliance on those promises and representations when he accepted the job and then reasonably expected, based on what he had been told by defendant, to remain in the job for some years, would be particularly unjust given that defendant prevented plaintiff from remaining in the job, first, by breaking many of defendant's own promises, and second, by terminating plaintiff with no prior written or other appropriate comprehensive evaluations and no adequate reasons apart from those following from defendant's own broken promises.


**VIII**

**Request for Relief**

WHEREFORE, plaintiff requests that this Court enter a judgment against defendant:

A.  Ordering defendant to reinstate plaintiff with back pay;

B.  Ordering defendant to pay plaintiff front pay;

C.  Awarding plaintiff damages for breach of contract and promissory estoppel;

D.  Awarding plaintiff attorneys' fees and court costs;

E.  Awarding plaintiff liquidated damages pursuant to the District of Columbia Human

Rights Law;  and

F.  Granting such other relief as this Court may deem just and proper.

/s/

_____
JOEL D. JOSEPH
LAW OFFICES OF JOEL JOSEPH
7272 Wisconsin Avenue, Suite 300
(301) 941-1989
Bethesda, MD 20814
Attorney for Plaintiff

DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and the Seventh

Amendment to the Constitution of the United States, plaintiff demands a trial by jury.


/s/

_____
JOEL D. JOSEPH
LAW OFFICES OF JOEL JOSEPH
7272 Wisconsin Avenue, Suite 300
(301) 941-1989
Bethesda, MD 20814
Attorney for Plaintiff